## TOLEDO SOCIETY FOR CRIPPLED CHILDREN ET AL
## v. CLARENCE H. HICKOK ET AL.

No. A-3938. Decided October 7, 1953.
Rehearing overruled November 18, 1953.
(261 S. W. 2d Series 692)

*Marshall, Melhorn, Bloch & Belt, Williams, Eversman & Morgan, Effler, Eastman, Stichter & Smith, Spengler, Nathanson, Hebenstreit & Heyman,* all of Toledo, Ohio, *Turner & Seaberry, Virgil C. Seaberry,* of Eastland, *Black & Stayton* and *John W. Stayton,* both of Austin, for petitioners.

It was error for the Court of Civil Appeals to hold that the will of Arthur S. Hickok should be construed other than by the Texas law, since it purports to give to charities an interest in immovables (land) situated in Texas, it must be decided by the law of the situs irrespective of whether the doctrine of equitable conversion is otherwise applicable; and the fact that the interest presently given each of the charities is subject to defeasance under certain circumstances and that the charities, in the discretion of the trustees, may ultimately realize the proceeds of the sale of said lands instead of interests therein does not make the remainders contingent rather than vested. Munsey v. Mills & Garrity, 115 Texas 469, 283 S. W. 754; Clarke v. Clarke, 178 U. S. 186; Caples v. Buel, 234 S.W. 429; Caples v. Ward, 107 Texas 341, 179 S.W. 856.

*Fuller, Harrington & Seney,* of Toledo, Ohio, *Scarborough, Yates Scarborough & Black* and *J. R. Black, Jr.,* all of Abilene, and *Vinson, Elkins & Weems,* and *C. E. Bryson,* all of Houston, for respondents.

The Court of Civil Appeals correctly held that petitioners have no present or vested interest in any real estate located in the State of Texas and that, at the most, all they could

have under the will was right to a fund to be created at the end of twenty years out of the residue of the testator's residuary estate, since they have no rights in any of testator's property. House of Mercy of New York v. Davidson, 90 Texas 529, 39 S. W. 924; John Hancock Mutual Life Ins. Co. v. Yates, 299 U. S. 178, 81 L. Ed. 106; Jenkins v. Guarantee Trust & Safe Deposit Co., 53 N. J. Eq. 194, 32 Alt. 208.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

Our petitioners — sundry charitable, religious and similar enterprises, including the Toledo Society for Crippled Children — seek in this suit against the respondents, who are the two children, widow, executors and trustees of the late Arthur S. Hickok, an Ohio resident, to establish their rights specified in Mr. Hickok's will, but only to the extent of certain lands, and mineral estates in land, located in Texas. All of the parties to the suit appear to reside in Ohio or have their corporate offices there. The facts are without substantial dispute. The sole obstacle to the enjoyment by the petitioners of the benefits conferred by the will is that the latter was executed less than a year before the testator died leaving issue surviving. Under such circumstances, an Ohio statute (which has no counterpart in our law) declares testamentary gifts to enterprises such as the petitioners to be invalid. See Footnote [1] In previous litigation between the same parties, the Ohio courts have in general terms adjudged the statute to be applicable. See Kirkbride v. Hickok, 155 Ohio St. 293, 98 N. E. 2nd 815. In the instant suit, the District Court of Eastland County, on motion for summary judgment, held the gifts valid in respect of part of the Texas property in question and invalid as to the rest. The Eastland Court of Civil Appeals reformed that judgment so as to deny the petitioners any relief whatever—stating that their interest was contingent rather than vested. 252 S. W. 2d. 739. We granted writ of error upon rehearing of the petitioners therefor.

The will, in brief, after a few minor specific bequests of no materiality here, left the residue, consisting of both real and personal property in Ohio and elsewhere valued at several million dollars, as a trust, with provision to pay the income to cer-

---

Footnote [1] "If a testator dies leaving issue of his body, or an adopted child, living, or the lineal descendants of either, and the will of such testator gives, devises or bequeaths the estate of such testator, or any part thereof, to a benevolent, religious, educational or charitable purpose * * * or to a person in trust for such purposes * * * such will as to such gift, devise or bequest, shall be invalid unless it was executed according to law, at least one year prior to the death of the testator." (General Code of Ohio, Sec. 10504-5).

tain individuals, principally the widow (who has elected to take her statutory portion rather than under the will) and children (who are both adults) for 20 years, then to divide the corpus into five so-called "funds", which are respectively defined merely as a certain "per-cent" of the total corpus on hand at that time, forthwith distributing each fund equally among the charitable or religious entities named as the respective beneficiaries thereof (our petitioners being included under one "fund" or another). The powers of the trustees, which the will specifies in careful detail, included a general one to sell property of the corpus (but without directions so to do) and express authority to retain (without risk of liability) the original corpus assets, real or personal, to invest and reinvest in both reality and personalty, and also the right to make final distribution in kind upon their own exclusive valuation of the property concerned. The Ohio judgment abovementioned in effect lifted out of the trust as invalid the provision for the remainder to the petitioners and substituted a provision that at the end of the twenty-year period the corpus should pass as intestate property. Kirkbride v. Hickok, supra.

The greater part of the estate consisted of *movables*, which were personalty situated outside of Texas, and as to it the propriety of applying the domiciliary law which ordinarily governs testamentary disposition of movables wherever situated, is naturally not questioned in this suit. Restatement of the Law, Conflicts, Sec. 306. The property, as to which the question *is* raised, may be said more particularly to consist of (a) a tract of Texas land and a few mineral interests in Texas land, owned by Mr. Hickok individually at his death and presently not of great value; (b) similar mineral interests of considerable value, which at the death of the testator were owned by a partnership called "Hickok & Reynolds", of which the testator and Harry Reynolds of Cisco, Texas, were the partners.

█ It is perhaps appropriate to observe at this point that, minerals in land or "in place" being, by our local law, land, we are admittedly well within our rights in characterizing the mineral estates here in question as Texas land for purposes of the Conflict of Laws as well as for purely domestic purposes. See Restatement, supra, Sec. 208.

As to the partnership property, certain additional and undisputed facts are said to be important. On January 25, 1945, the testator and Reynolds, by a writing, agreed to organize

promptly for themselves a corporation under the name of "Hickok & Reynolds, Inc.," with a relatively small initial capitalization but clearly with the idea that at some time after the incorporation all the partnership assets would be transferred to the corporation in exchange for additional stock, of which each partner should thus receive an equal amount. Detailed reference was made to possible death of the parties, which was to be at least no obstacle to the incorporation of the partnership. The pertinent provisions are quoted in Footnote [2] below.

Thereafter on February 10, 1945, the testator executed his will, of which we need mention at this point only one of the final provisions (Item XIV) relevant parts of which are copied in Footnote [3] below. In brief it incorporated the contract by

---

Footnote [2]. "Thereafter at the request of either partner, or his executor or administrator to the other, or in the event of his prior death to his executor or administrator, the partners as the stockholders of said corporation, will cause the authorized capital stock thereof to be increased to 10,000 common shares of stock of the par value of $100.00 each, and each party agrees that as soon as said capital stock has been so increased, he will duly convey, transfer, and assign to said corporation each and every asset of the partnership, including all good will and business thereof, whether standing in the name of the partnership or in the name of individuals, and each said partner agrees that in consideration thereof he will cause the corporation to issue to the partners, one-half to each, shares of capital stock of the corporation of par value equal to the net worth of the partnership as shown by the audit of the firm. * * * ·

\* \* \* \* \*

"Should the incorporation and organization of said Hickok & Reynolds, Inc. not have been completed and the assets of the firm fully assigned, transferred and conveyed to the corporation at the death of either of the partners hereto, it is agreed that immediately thereafter, without demand the surviving partner, if any, and the executors, or administrators of the deceased partner or partners, will duly assign, set over and transfer all of the assets of said partnership, both real, personal and mixed as hereinbefore provided and will accept and receive the stock of the corporation as payment therefor, as fully and to all intents and purposes as the partners have done prior to death; and that until the consummation of said transfer, assigning and setting over, the surviving partner and the executors or administrators of the deceased partner or partners shall continue to carry on the business of the partnership as fully and with all the powers and to all intents and purposes as though both were then surviving.

\* \* \* \* \*

"Each party hereto also agrees that he will, by his duly executed last will and testament, authorize, direct, and empower his executor or administrator to carry out the agreements of this contract and to make the sale, transfer and assignment of the assets provided for herein and accept in payment thereof said stock of Hickok & Reynolds, Inc."

---

Footnote [3]. "On February 16, 1937, the testator and Harry Reynolds, of the City of Cisco, Texas, entered into a contract of copartnership and on the date of January, 1945, entered into an amended and supplemental agreement thereto, which last agreement provided, among other things, for the incorporation and organization of Hickok & Reynolds, Inc., a corporation under the laws of the

reference and *directed* the executors "to join with said Harry Reynolds in assigning * * * to said Hickok & Reynolds, Inc., all right, title and interest in and to the assets of the partnership of Hickok & Reynolds, upon receipt by them of one-half of the stock of said corporation * * *."

About the middle of April, 1945, Hickok & Reynolds, Inc., was incorporated in Ohio more or less as agreed upon, and by about two weeks before Mr. Hickok's death on June 30, 1945, all of the originally authorized capital stock ($25,000) had been subscribed for equally by the two partners, although the greater part of Mr. Hickok's half was not issued until after his death. On July 16, 1945, the authorized capital was increased to the agreed maximum of $1,000,000 par value, and at the same time the corporation accepted a contemporaneously dated proposal from Mr. Reynolds and the executors to transfer to it all of the assets of the partnership in exchange for the assumption of certain debts by the corporation, the payment of approximately $25,000 cash each to Mr. Reynolds and the Hickok estate and the issuance to each of the two latter of stock of $366,000 par value. The properties were accordingly transferred in August, 1945, and the corresponding stock certificates issued respectively to Mr. Reynolds and the executors in 1946.

■ Assuming, for purposes of discussion, that we are dealing with the simple case of an Ohioan, who dies seized of Texas lands free of any obligation to sell, and whose will makes an ordinary devise of a remainder in such lands to beneficiaries such as the Toledo Society for Crippled Children, it is not disputed or disputable that under proper principles of the Conflict of Laws the validity of the devise is to be determined by reference to Texas law (which permits it) and not by the domiciliary statute (which forbids it). Restatement, Conflicts, Sec. 249;

State of Ohio, and for the conveyance and transfer to said corporation under certain conditions of all of the assets of said copartnership and provided that in the event of the death of either of the partners, the surviving partner and the executors or administrators of the deceased partner or partners would duly assign, set over and transfer to said corporation all of the assets of said partnership, real, personal and mixed, as therein provided, and would accept and receive the stock of said corporation as payment thereof, as fully and to all intents and purposes as the partners might have done prior to their death. I therefore direct, authorize and empower my executors promptly after my death to join with said Harry Reynolds in assigning, transferring and conveying to said Hickok & Reynolds, Inc., all right, title and interest in and to the assets of the partnership of Hickok & Reynolds, upon receipt by them of one-half of the stock of said corporation in the amount computed as set forth in said agreement and to assure to the executors full authority, I refer to said contract for the terms and conditions thereof and make said contract a term of this will."

Goodrich on Conflict of Laws, (3rd Ed.) Sec. 166; Beale, Conflict of Laws, Sec. 249.1; Stumberg, Conflict of Laws, p. 415; Paschal v. Acklin, 27 Texas 173, 174; Ball v. Norton, Texas Com. App., 238 S. W. 889; United States v. Calcasieu Timber Co., 5th Cir., 236 Fed. 196; Lowe v. Plainfield Trust Co., 216 App. Div. 72, 215 N.Y.S. 50; Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401.

Nor would the above conclusion be varied by the bare fact that the devise runs to a trustee rather than to the beneficiary direct. Restatement, supra, Sec. 241; Goodrich, supra; Beale, supra, Sec. 241.1; Stumberg, supra, p. 431; Paschal v. Acklin, supra.

■ Our courts, by reason of their ultimate power over lands situated within our state, no doubt have the *jurisdictional* authority in a given case to vary the above rule and apply the domiciliary law in preference to our own, if they should find compelling reasons so to do. But such a case would be a rather exceptional one, since each departure from the usual rule tends to precedential complications and uncertainties in a field of law already difficult enough under the basic rules. Nor do we regard cases of the type now before us as necessarily exceptional. The mere fact that the courts of Ohio happen to have acted first in the matter is no more persuasive to us than the converse situation would be to the Ohio courts, assuming the "full faith and credit" clause not to be applicable. The fact that the administration of the trust is apparently to be directed from Ohio would not seem of great importance. A holding on our part that the remainder gift to the petitioners is valid as to the Texas lands would not unduly complicate the administration of either the estate or the trust. Since the trust admittedly must stay in existence for the twenty-year term stipulated in the will, the validity of the remainder as to the Texas lands would simply mean that at the end of the period those lands or their equivalent would pass to the petitioners, while the other assets of the trust or their equivalent will pass to the respondent children. Nor do we know of any precedent to the effect that the law, which normally governs the validity of a trust of land, should be waived merely because the land happens to be of less value than the rest of the trust property governed by a different law, or because all of the contending parties happen to reside beyond the state of situs.

As a consequence of the basic rules abovementioned, courts

of a state, which is *not* the situs of the land involved in a questioned devise, or devise in trust, are, generally speaking, without right to apply a law different from that of the situs, and their judgments assuming such a right are not protected by the "full faith and credit" clause of the Federal Constitution, Art. 4, Sec. 1, Clarke v. Clarke, 178 U. S. 186, 20 Sup. Ct., 873, 44 L. Ed. 1028. The latter decision holds that, for purposes of "full faith and credit", the courts of the domicile of the testatrix (South Carolina) could not finally determine the will to have worked a conversion into personalty of land situated in Connecticut, so as to deprive the courts of the latter of the power to distribute it as Connecticut realty thereafter, because a contrary holding would violate the rule that the law of the situs governs the matter of testamentary or intestate succession to land. As hereinafter discussed, there is some "conflict in the Law of conflicts" as to whether the equitable fiction of conversion of realty to personalty, or vice versa, is relevant to the process of choosing between the law of the situs and that of the testator's domicile; but the rule of Clarke v. Clarke, supra—that the issue of conversion *vel non* is determined by the law of the situs of the land said to be converted—does not appear to be questioned. Restatement, Conflicts, Sec. 209; Goodrich, supra, Sec. 166, (p. 509) ; Beale, supra, Sec. 209.1. As these same authorities demonstrate, the question of whether a particular thing is to be treated or regarded as movable or immovable must be determined in the first instance and as a basis for the operation of the Conflict of Laws by the law of the state where the thing is actually situated. Accordingly, the question presented to us cannot be considered as already finally determined by the Ohio courts, even if the words of the latter might indicate that such was their own understanding of their decree. Conceivably, if the petitioners had voluntarily invoked a decision of the Ohio courts on the very point of whether the gifts were valid as to the Texas lands, we might defer to the result. But such was not the case, nor evidently did the Ohio tribunals so consider it. In the probate court, the executors and trustees did apparently make the point that there was an equitable conversion—and no doubt with the object of securing a declaration that the Ohio statute governed even as to foreign lands of the testator, but the judge, while apparently of the opinion that *we* would or should hold that the Ohio statute governs as the result of an equitable conversion, rather clearly indicated that the final answer lay with the Texas law and Texas courts. The Supreme Court of Ohio does not discuss the point, although, having the matter of the validity of the gifts ob-

viously before it to the extent of the movable property of the testator, it had to determine that much and held the gifts void against the contention that the respondents, the children, had waived their right to invoke the statute by accepting benefits under the will. 98 N. E. 2d. 815, 818.

What has been said would appear to dispose also of any idea that the instant suit of petitioners presents merely theoretical issues. The suggestion presumably is that the fact of the testator's domicile in Ohio, the existence of the Ohio statute and the decree of the Ohio courts separately or together indicate on the part of the latter a purpose of policy to defeat the gifts, by one means or another, even though, as to the Texas property, we should hold them to be valid under proper principles of the Conflict of Laws. The means in question apparently are the power of the Ohio courts over the *parties* concerned in the matter, including the Ohio corporation, Hickok & Reynolds, Inc. But obviously, neither the statute nor the decree evidence a purpose to employ compulsive jurisdiction over persons in order to thwart proper decisions of other states. Nor would any such unlikely purpose be effective. Clarke v. Clarke, supra. If Ohio has physical power over our Ohio petitioners and the Ohio corporation, we in turn have physical power over the Texas property and can at least effectively deprive the respondents, the corporation or even the executors and trustees of its enjoyment. If we decide for the petitioners, the only reason the Ohio courts might entertain to disregard our decision would be that we have disregarded rules of the Conflict of Laws, and the correctness of such a conclusion would, of course, be for final determination by the Federal Supreme Court, as evidenced by the Clarke case. The question of the effectiveness of our decision is thus no more nor less than what the petitioners call upon us to decide—whether under the rules of the Conflict of Laws we should or should not apply the Texas law to the will, so as to hold the petitioners to be *cestius que trustent* of a valid remainder in the Texas property.

The position of the petitioners is, in substance, that the case is comparable to the aforementioned example of a simple devise or devise in trust of Texas lands, and this notwithstanding the "fund" terminology in respect of final distribution of the corpus and, as regards the partnership property, notwithstanding the contract and all the other special circumstances heretofore described. The opposing thesis of the respondents is that these circumstances, by the law of Texas as well as that of Ohio,

present a case of equitable conversion of all the testator's estate into personalty, with the result that we must regard the will as involving only personalty. Similarly, they appear to say that the will left the petitioners no interest in the Texas property (or other specific property of any kind). Either approach, they argue, forecloses application of any law except that of the testator's domicile to the matter of validity of the trust remainder.

We will consider first the partnership property. The fact that since the testator's death, it has been put into the form of corporate stock does not of itself affect the problem, because we are dealing with the validity of what the testator himself did, as judged by the applicable law, which depends on what kind of property he had at his death, rather than what kind exists at the time of litigation. As to what happened before his death, it may doubtless be conceded that the will alone, without aid of the subsequent conduct of the testator himself in the organization of the corporation, shows a clear intent that his interest in the partnership should be put into the form of corporate stock at the earliest practical date after his death. The situation is thus comparable to one wherein the testator instructs his executor to trade his land for corporate stock and give the stock to the beneficiary. Or, looking at the contract between the testator and his partner, it is not unnaturally argued that this alone, and aside from the will, was enough to change into a movable or personalty that which had previously been an interest in immovables or land, as would obviously have been the case had the testator sold his interest and received, before his death, stock, cash or an unsecured promissory note in return. That, but for the contract, the testator had, through his partnership interest, an interest in land, does not seem to be contested. Munsey v. Mills & Garrity, 115 Texas 469, 283 S. W. 754.

Assuming the theory of equitable conversion to be relevant to the process of determining the applicable law, then, looking at the case from the standpoint of either the will itself or the contract or both, there are presented situations of the type in which our courts, for at least certain domestic law purposes, declare a conversion to have been effected. In Hardcastle v. Sibley, Texas Civ. App., 107 S. W. 2d. 432, (writ of error refused) a direction in the will of Mrs. Crosby to sell land and distribute the proceeds to the beneficiary (Mrs. Wood) was held to convert the land in question into personalty so as thereafter to pass as such by the will of the beneficiary herself. (The fact that Mrs. Crosby's executors had actually sold the land after her death was said to be immaterial). The case is also authority

for the point that where the testator's contract of sale of his land is virtually carried out during his lifetime, the land is treated as personalty for the purposes of the will. In Willie v. Waggoner, Texas Civ. App., 181 S. W. 2d. 319, (writ of error refused) the testator, who had written his will so as to devise his ranch to a friend, with the residue of his estate to go to a sister, thereafter entered into an earnest money contract to sell the ranch. This was actually held not to be an ademption of the devise through conversion, but only for the reason that the right of the purchaser to withdraw from the contract by mere forfeiture of his earnest payment rendered it not specifically enforceable.

There appear to be no Texas decisions on the point of whether rules of equitable conversion are to be used in determining whether the nature of the property in question is such as to invoke the law of the situs or that of the domicile. And those very few cases from other jurisdictions, which seem to consider such rules as relevant, apparently follow the same principles exemplified in our Texas decisions in deciding whether a given set of facts is one of conversion or otherwise. The Wisconsin and Michigan decisions in connection with the same will, Ford v. Ford, 70 Wis. 19, 33 N. W. 188; Id. 80 Mich, 42, 44 N. W. 1057, held that the direction to the executors to sell land situated in those states and invest the proceeds in Missouri land to be held in trust, effected a double conversion from land to money to Missouri land, with the result that the Wisconsin and Michigan rules against perpetuities, which would otherwise have invalidated the trusts as to the Wisconsin and Michigan lands of the testator, had no application. But, as to the property which the will gave no positive direction to sell, it was held that no conversion occurred. Penfield v. Tower, 1 N. D. 216, 46 N. W. 413 actually held that no conversion was effected by the terms of the testamentary trust of North Dakota land and personalty for several beneficiaries, not greatly different from that of the Hickok will, and accordingly applied the North Dakota rule against perpetuities, as against that of Pennsylvania, the testator's domicile, thus defeating the trust to the extent of the North Dakota land. But the implication is rather clear that, had the will necessarily disclosed an "intent" for the land to be sold, the court would have applied the domiciliary law, on the conversion theory. The English decision, In re Piercy (1895), 1 Ch. 83, is reliably considered as (though criticized for) having "proceeded largely on the ground that the will effected an equitable conversion of the land into personalty", in holding English

law to govern the effect of a devise by an Englishman of Italian land to a trustee with direction to sell and invest the proceeds in English securities or land. See Beale, supra, pp. 958-9.

Contrary to the decisions, or implications thereof, last mentioned are the English and Canadian cases of Re Berchtold (1923), 1 Ch. 192, and Re Burke (1928), 1 D. L. R. 318, each of which, both in result and words, and with considerable citation of English authority, clearly refuses to base the choice between conflicting laws of the situs and domicile upon the principle of equitable conversion. In the first, English land was devised by a Hungarian in trust for the very purpose of being converted to money and thus distributed to two Hungarian beneficiaries, both of whom died intestate before the sale was made. It was held that: (a) the nature of the interests of these beneficiaries as *movables* or *immovables* should be determined by English law; (b) by that law the interests were immovables; (c) their distribution was accordingly to be made without regard to the law of the domicile of the two deceased owners and according to English law; (d) the latter requiring that such interests be distributed as *personalty* (although *immovables*) they should go to the persons who by English law would take the *personalty* of a deceased English intestate. Thus, although by English law, the interests in question were *personalty* for distribution purposes, they were yet immovables for purposes of determining whether the laws of England or those of Hungary applied. In discussing the latter question, the court said that the point of whether the interests were regarded as realty or personalty under principles of conversion or otherwise had nothing to do with the choice of which of the conflicting laws of England and Hungary should govern. The court cites various instances of interests, which by the law of England are immovables, some of them being doubtless personalty by that same law and many entailing no actual benefits to the owner except in the form of money. (A common example given elsewhere is that of a leasehold, which, for purposes of the Conflict of Laws, is an immovable—an interest in land—although treated as personalty for some domestic purposes. Restatement, supra, Sec. 249, Comment d.)

Re Burke, supra, held that where an American contracted to sell his Canadian land and then died intestate, the distribution of his estate was governed by the law of Canada, rather than the domiciliary law, to the extent of this land or its proceeds, including the money which had been actually paid after his

death for one particular tract. The court not only declared the fiction of equitable conversion to be irrelevant to the choice between conflicting laws, but also rejected the suggestion that, as a result of *actual* conversion, the intestate died possessed of merely a chose in action for money, while the purchaser was the owner of the land, thus holding the interest of the intestate at death to be an interest in land, subject to the contract.

In Lowe v. Plainfield Trust Co., 216 App. Div. 72, 215 N.Y.S. 50, which is said in some texts to reject the conversion theory as applicable to cases of conflicts of laws, the result was to apply to charitable devises of New York land the New York statute against charitable gifts by will exceeding half of the estate (as against the domiciliary law by which the gifts were valid) despite an actual sale of the lands by the executors subsequent to the testator's death, pursuant to a power given in the will. This sale was the basis of a contention that the domiciliary law should apply on the theory of conversion. The court answered this by the statement that a party could not rely on the sale for conversion purposes unless the will authorizing the sale were valid, and that the latter was the very point in issue. The decision can hardly be considered an American counterpart of Re Berchtold or Re Burke, both supra.

Norris v. Loyd, 183 Iowa 1056, 168 N. W. 557, sometimes cited against the conversion thesis, applied the law of the situs (Iowa) to uphold the gift of a Californian, whose will directed his executor to sell the Iowa land and distribute the proceeds to the testator's "children", the latter meaning by Iowa law only legitimate children. By the California law, his illegitimate but recognized son would have taken a portion notwithstanding such a will. It was evidently argued without effect that, because of conversion, the California law should apply, but the opinion is less than clear as a holding that equitable conversion is irrelevant to the choice between conflicting laws.

Among the text writers, Goodrich (supra, Sec. 166, p. 508) alone appears to accept the conversion thesis on the strength of cases such as Ford v. Ford, supra, while others take a definite stand against it. Beale, supra, Secs. 208.1, 209.1, 251.4, 306.6; Stumberg, supra, p. 337, footnote 4; Falconbridge, 18 Canadian Bar Rev. 568. The Restatement (supra, Sec. 249, Comments c and d, Sec. 306, Comment f) is in accord with these latter views.

One other decision should doubtless be mentioned. In Jen-

kins v. Guarantee Trust & Safe-Deposit Co., 53 N. J. Eq. 194, 32 A. 208, the Pennsylvania testatrix had (in effect) land in New Jersey and certain other property, the value of the latter being just enough to pay her debts. Her will made several money bequests, including primarily one of $5,000 to a Pennsylvania charity, and devised all lands to the executor with express authority to sell in order to pay debts or legacies generally. By a Pennsylvania statute such a gift to charity would be void, since the will was executed less than a month before death; but New Jersey had no such statute. It was evidently argued that the domiciliary law applied on the theory of equitable conversion, the lower court rejecting the contention on the ground that the will gave no positive direction to sell. The New Jersey Court of Errors and Appeals reversed and applied the domiciliary law, stating that the matter of conversion was immaterial, since the will made a mere money bequest to the charity rather than a devise. In our view, the language of the opinion suggests a different result if, for example, the will had expressly provided that the $5,000 in question should be paid out of the proceeds of sale of the land. In any event, the court disclaims reliance on the theory of equitable conversion.

■ We are disposed to agree with the majority of the text writers, whose view appears to be also the view of the Restatement, that the fiction of equitable conversion from realty to personalty or vice versa, "can have no place in the Conflict of Laws". The generally stated reason seems a sound one, to wit, that this body of law is really private international law and not merely a system for operation between the common or English law states of the United States or between these and common or English law nations. Thus to use as a basis for selection of a particular law between conflicting laws a doctrine which may not even exist in some jurisdictions is obviously less desirable than a more realistic basis such as the movable or immovable character of the object in question. As argued by the petitioners, it would in some cases result in state or nation. A deferring to the law of state or nation B, when the latter in a converse situation would not reciprocate. It would thus also be more likely to produce unnecessary confusion in particular instances. For example, a domiciliary of nation N may die, leaving cattle there as well as in state S and having made a will directing that all his cattle be sold and converted into land in S, a remainder in which shall go to a charity (to the disappointment of his children who live in N). The remainder, we will assume, is prohibited by a statute of the domicile (N) but valid by the laws

of S. We also assume that N does not have the doctrine of equitable conversion, whereas S does. The courts of N would thus probably invalidate the remainder to the extent of the cattle in N on the theory that succession to movables is ruled by domiciliary law, while the courts of S would probably uphold it as to the cattle in S on the theory that, these being equitably converted to land in S, the law of S should control. Such a result obviously disrupts the otherwise fairly simple operation of the rule that succession to movables is determined by domiciliary law. If the instant case were varied so that Mr. Hickok had no land, but directed by his will that all his stocks and bonds should be forthwith converted into Texas land and the land conveyed to the petitioners, one is inclined to doubt if the Ohio courts would uphold the gift on the theory that an equitable conversion made the Texas law applicable. Or, were our case one of a *Texas* testator, who by will directed conversion of his Texas cattle into Ohio land for the use of these Ohio petitioners, we are disposed to question that the Ohio courts would consider the gift invalid on the theory that equitable conversion made the Ohio statute applicable.

Of course, the "characterization" of what the deceased had at his death and what he makes out of it by his will in the course of transmitting it to a given beneficiary, may involve legal, and conceivably equitable, questions necessary to decide in order to say whether the thing passing by the will is a movable or immovable. Thus in Re Burke, supra, the court analyzes the character of the intestate's property—a combination of land and his contract to sell it—and on legal principles decides that this amounted to an interest in land rather than a mere claim for money, as would have been the case, had he given the purchaser a deed in exchange for corporate stock or even a completely unsecured note. But it requires another step altogether to say—contrary to the actual facts—that the contract had been carried out, and that the intestate therefore had no interest in land, but only money. And, of course, the field of operation of the fiction, that what "ought to be done" is actually done, is quite limited even in domestic law. Where there is question, for example, of whether a mortgage of land may be validly assigned by word of mouth or whether an "oil payment" of X dollars is taxable as land, we do not resolve these problems by first assuming that the mortgage or the oil payment have been paid off. Thus in using legal and equitable principles defining property rights, as a basis for the choice between conflicting

laws, we do not necessarily have to use also the fiction of conversion.

We need not, therefore, decide whether in a proper case for the domestic application of equitable conversion, the partnership mineral interests here in question would be regarded as personal property for the purposes of the will. It is enough to say that at Mr. Hickok's death he was the owner of a half interest in these minerals, subject to a contract that they should be converted into corporate stock, just as the land of the deceased in Re Burke, supra, was subject to a contract of sale. And the circumstances that the will, in effect, directs the contract to be carried out, does not change the fact that, on Mr. Hickok's death, what passed for the benefit of the petitioners and others was his interest in the minerals, just as in Re Berchtold, supra, the devise of land in trust to be sold for the use of the beneficiaries passed to the latter an interest in the land. If this view should impress some as legalistic in the sense of excluding the intent of the testator that his mineral interest should become corporate stock, it is hardly more of a "technical" approach than that of regarding "as done" that which was *not* done, in order to deprive the petitioners of the last remnant of benefits the testator obviously intended them to have, and, in effect, to enforce here a legislative policy of Ohio, which is contrary to the policy of our own Legislature.

The view most stressed by respondents in this court is that the will purports to give no interest in immovables to the petitioners, and it is said that this was what the Court of Civil Appeals had in mind in speaking of the contingent character of the interest in question. (Certainly a contingent interest in land is a interest in land, if it is anything at all, and as such its validity is as much a matter of the law of the situs as is any other interest in immovables. Restatement of the Law, Property, Sec. 162, Comment d). There would be more point to the argument, if the trust had provided that these petitioners should have no benefit out of any land passing to the trustees, or out of its proceeds, but such is not the case. To argue that the will is no will of immovables so far as the petitioners are concerned is in substance to say that, for example, a testamentary "spendthrift" trust of a large farm and one cow, to pay the income to X for life and the principal thereafter to Y, coupled with discretionary power of the trustee to sell and invest the proceeds in personalty or other lands, gives no interest in land to either beneficiary, and this clearly is unsound. By the same token, no

594

beneficiary in the instant case would have an interest in either movables or immovables, so there is no reason to apply either the law of Ohio or that of Texas. The argument is really no more than another way of injecting the thesis of equitable conversion.

*A fortiori* we conclude also that our law governs the validity of the trust remainder with respect to the Texas interests owned by Mr. Hickok individually at his death. Indeed, as to these interests, there is insufficient ground on which to claim equitable conversion. The observation of the learned Ohio probate judge, that the division of the corpus into simple fractions for final distribution purposes necessarily involves converting it into money, seems irreconcilable with provisions of the will, such as the plain authority of the trustees to hold the original assets and to make ultimate distribution in kind (as well as money) at valuations within their own exclusive discretion. The very paragraph which is said to make the remainder "contingent" provides that the petitioners must at the time of distribution be able to accept a "devise," without certain tax consequences, as well as a "bequest", and actually uses the same studied language twice. And since the trustees are given the express power to invest and reinvest in "real estate" as well as in other things, one might, fictionally speaking, argue quite as logically that the whole will was one of land as that it was one of personalty. The word "fund", used briefly as aforesaid, and easily susceptible of a meaning such as "portion", certainly does not control everything else in the will to the extent of requiring that every asset of the trust except cash be sold, with all the attendant expense and possible depreciation of values. And there is no more indication that lands are to be sold than corporate securities. Land can be conveniently valued for distribution purposes in terms of dollars per acre, just as stocks can be valued in dollars per share.

The effect of the foregoing being to hold that as to all the abovementioned lands, and mineral interests in lands, situated in this state, the will of Arthur S. Hickok is valid and passed to the petitioners the interests in trust which it purports to pass, it follows that the judgment of the Court of Civil Appeals should be reversed and the judgment of the trial court modified so as to conform to our holding. It is so ordered.

Associate Justice Griffin dissenting.

Opinion delivered October 7, 1953.

Rehearing overruled November 18, 1953.

Certiorari to the Sup. Ct. of the United States denied, 347 U. S. 936 (4), 74 Sup. Ct. 631 (4).